MICHAEL STEPANIAN
Attorney at Law (CSBN 037712)
819 Eddy Street
San Francisco, CA 94109
Telephone: (415) 771-6174
Facsimile:  (415) 474-3748

JENNIFER L. NAEGELE (CBN 232643)
P.O. Box 12375
San Francisco, CA 94112
(415) 519-9116
naegelelaw@gmail.com

Attorneys for Defendant
DAVID CONERLY

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>      v.<br><br>DAVID CONERLY,<br><br>             Defendant. | **Case No. 4:13-cr-00717-JST**<br><br>**DEFENDANT'S SUPPLEMENTAL INFORMATION RE MOTION TO SUPPRESS**<br><br>Date:    November 24, 2014<br>Time:    2:00 p.m.<br>Judge:  Hon. Jon S. Tigar<br>Dept:    Courtroom 9, 19th Floor |

Defendant submits this supplemental information pursuant to the Court's request for statistical background to determine the need for an Evidentiary Hearing on the issue of establishing the criteria for "high-crime area," pursuant to Defendant's original Motion to Suppress.

The Court issued a 17c subpoena to the Berkley Police Department for records of arrests in and around the area of 2748 Acton Street, Berkeley, California.  Ms. Parsons, of the Berkeley Police Subpoena Department, informed counsel that these records would take approximately two weeks to compile.  Thereafter, the Court set November 19th, a day by which records received pursuant to the subpoena would be forwarded to the Court.

In an abundance of caution, counsel hired Timothy O'Brien, an expert in micro-neighborhoods, gang violence, and who has experience in "high-crime areas" in various neighborhoods of Northern California.  I informed the prosecutor, AUSA Manish Kumar, of my hiring of Mr. O'Brien so that he may anticipate potential information or evidence on "high-crime area" evaluation.   At 3:00 p.m. this afternoon, counsel had a conversation with Ms. Parsons who stated, "she had found the statistics and would FedEx them to counsel tomorrow, November 20, 2014."  Counsel will provide these documents to the Court when received.

Attached exhibit is a declaration, data, and maps prepared by Mr. Timothy O'Brien.  This will inform the Court of the direction the hearing will take.  There are several well thought out Law Review articles on the subject, among these is, *The High Crime Area Question: Requiring Verifiable and Quantifiable Evidence for Fourth Amendment Reasonable Suspicion Analysis, American University Law Review,*

http://digitalcommons.wcl.american.edu/cgi/viewcontent.cgi?article=1036&context=aulr, and *It's Time to Define High-Crime:  Using Statistics in Court to Support an Officer's Subjective "High-Crime Area" Designation, New England School of Law,* which outline the need for statistical data and other evidence that would be helpful in defining the "high crime area" phenomenon.  Too many judges have just taken the word of a police officer in stating that the place in which the officer was operating at the time of the detention or arrest was a "high-crime area" without further inquiry, statistical information, or expert testimony.  The result of this is that the definition of the areas are divided as to its description.  For example, some courts have defined "high-crime area" as an area of expected criminal activity, one that is riddled with narcotics and drug related shootings.  Some courts found that a crime wave can create a "high-crime area."  Some areas are notorious or have a reputation for violence and crime.  The Ninth Circuit recognized "the question is not whether the characteristics of the area may be taken into account, but how the characteristics are established."

*U.S v. Montero-Carmargo*, 208 F.3d 1122, 1143 (9th Cir. 2000)(en banc), presents an interesting introduction to the question of the "method of proof" because, while critical of officers relying on past "war stories" about certain areas, the court did not rely on much more than these types of war stories to determine that the site at issue was a "high-crime area."  As pointed out in the sharply worded concurrence authored by Judge Kozinski in *U.S v. Montero-Carmargo*:

The opinion recognized the danger in allowing the police to characterize an area as "high-crime" to establish a basis for reasonable suspicion, but then proceeds to do just that, based on nothing more than the personal experiences of two arresting agents.  As I discuss above, the agents didn't even claim this was a "high-crime area," but let's say they had.  What in this record would support their conclusion?  Both agents testified only that they had detected criminal violations after stopping people in the area.  How often?  One agent said he'd been involved in 15-20 stops over eight and a half years, and "[could]n't recall any . . . where we didn't have a violation of some sort.  The other agent testified to "about a dozen" stops in the same period, all but one of which led to an arrest.

Without hesitation, the majority treats this as a crime wave, but is it really?  Does an arrest every four months or so make for a "high-crime area?" . . . Can we rely on the vague and undocumented recollections of the officers here?  Do the two officers' figures of "15-20" and "about a dozen" reflect separate pools of incidents, or do they include some where, as here, both officers were involved?  Are such estimates sufficiently precise to tell us anything useful about the area?  I wouldn't have thought so, although I could be persuaded otherwise.  But my colleagues don't even pause to ask the questions.  To them, it's a "high-crime area," because the officers say it's a "high-crime area."

It is about time that this fascinating subject is analyzed.  In determining what is a "high-crime area," courts must analyze evidence based on data over subjective assertions of police officers unprovable suspicions.  Evidence of what really is a "high-crime area" can be found through statistical data, expert testimony, or official police reports.  David Conerly asks for an Evidentiary Hearing on this matter in which he will be able to present data that is currently being collected through his counsel, an investigator who has provided an attached declaration, and the cooperation of the Berkeley Police Department, which is underway.  This evidence can then be tested and ruled on by the court.

Our Motion to Suppress is the beginning of this journey.  It is respectfully requested that an Evidentiary Hearing be granted on the definition of the location of the incident in question as a "high-crime area." There is also an issue as to the conduct of the police officers after confronting David Conerly.  He was not addressed in a *Terry* type stop context.  The officers had their guns drawn, yelling commands as David Conerly was pushed to the ground, handcuffed, taken outside, arrested and searched.

Dated: November 19, 2014                                Respectfully submitted,


                                                        _____
                                                                /S/
                                                        MICHAEL STEPANIAN
                                                        Attorney for Defendant

EXHIBIT

# DECLARATION OF TIMOTHY J. O'BRIEN

1.  My name is Timothy J. O'Brien.  I have worked as a criminal defense investigator in the Bay Area since 1994, and was licensed in 1998, lic# PI20790.

2.  I have a specialty in African-American street gangs, and have been both appointed as an expert by the court, as well as retained as such, in cases in San Francisco and Solano counties.

3.  I have investigated over 80 homicides and worked in many of the Bay Area's most crime-infested areas including: sections of Vallejo, North Richmond, the Iron Triangle area of Richmond, Bay Point, several neighborhoods of East Oakland, West Oakland, South San Jose, East Palo Alto, East Menlo Park, Marin City, the Canal District of San Rafael, and all the depressed and high crime neighborhoods of San Francisco including: the Excelsior, parts of the Mission, Sunnydale, Bayview-Hunter's Point, the Fillmore and Western Addition.

4.  My office is currently located at 4424 Third St. in the Bayview district of San Francisco. According to the San Francisco Police Department, that area is in the "safety zone" of an African American gang, Kirkwood/BNT.

5.  I attended the University of California, Berkeley in the 1980s and have lived in Berkeley continuously since 2000.

6.  I have investigated several cases in Berkeley as well as worked in Berkeley in connection with cases from outside the jurisdiction.

7.  I am familiar with the area surrounding San Pablo Park as I have brought my nephew and two of my children to sports practices there over the last 10 years, as well as coached my daughter's softball team which held some practices and games at San Pablo Park.

8.  I put in an offer on a house at Fairview and Sacramento streets, south of Ashby Ave. and two blocks north of Alcatraz in 2000 and did some research on that neighborhood at that time.  Additionally we have lived at McGee/University sts., Grant/Rose sts., as well as our current home near Solano Ave., all in Berkeley.  I am familiar with many of the neighborhoods in Berkeley and the relative safety I associate with each.

9.  Additionally, a teammate of my daughter from her soccer team lives on the 2700 block of Acton and I have been to their home socially.  I have also been to the home of other family friends on the 2700 block of Dohr, one street to the east of Acton.

10.  I was engaged by Michael Stepanian, attorney for David Conerly, to look into the character of the area where the police encountered Mr. Conerly on February 22, 2013.  I

have reviewed many of the documents relevant to this case including the police reports, motions to suppress as well as the government's opposition to the motion and all the exhibits.

11. I personally visited the area on November 11, 2014. The area of Park and Acton streets is comprised of single family homes. I noticed unattended, young children playing in front of homes as well as numerous homes with Halloween decorations and pumpkins still up. I saw nothing on November 11, 2014 to suggest it is a 'high crime area,' consistent with the many 'high crime areas' I have worked in or where my office is.

12. Find attached as Exhibit A, a screen shot from a real estate website called zillow.com which gives estimates of home values. Depicted in the screen shot are Park and Acton streets between Ward and Oregon sts. Note that some of the homes on the 2700 block of Acton are valued at over $1 million dollars.

13. Included in the government's opposition to the motion to suppress, was Exhibit C (not appended) in which a crime map for the area was generated for the time frame 4/16 - 10/12/14. The mapping program I was available to access, like the one generated by the government is limited to six months prior to today's date. Additionally the user can search by various crime types. The government's Exhibit C's search criteria was 'all crimes.' There also appears to be a limit of 800 crimes that can be depicted on the screen and if that limit has been surpassed by the search criteria the user is instructed: "The map can't plot any more crimes. Zoom in." The timeframe can also be shortened to obtain useable data.

14. Exhibit B (appended) is a screenshot I captured from that crime mapping program, using the same criteria as the government namely 'all crimes.' I had to shorten the timeframe to get a useable map, and so I used 10/31 – 11/19/2014. As is evident by Exhibit B, using such criteria creates the impression that nearly all of Berkeley is a 'high crime area.' I did not find using such criteria to be helpful in determining which areas are 'high crime.'

15. Exhibits C, D and E are screenshots from the same mapping program, from the time period 5/18 – 11/14/2014. To get meaningful data, I chose as my criteria of 'crime type,' the following: drug offenses, weapons offenses, homicides and robberies, those street level crimes that to my mind and experience characterize 'high crime areas.' Exhibits C and D are roughly the same scale, with Exhibit C being the southern portion of Berkeley including San Pablo Park and Exhibit D extending north from San Pablo Park. Exhibit E endeavors to show all of Berkeley using a smaller scale. Notable in these maps is the low incidence of those crime types in the area of the incident in this case, including the complete absence of those offense types on Park and Acton streets between Ward and Oregon streets.

16. In short, the research I have done in this area - in the absence of statistics provided by the Berkeley Police Department - in conjunction with my visit to the area, my extant familiarity with the area and other areas of Berkeley and my 20 years experience of working

in actual high crime areas, all suggest to me that Park and Acton between Oregon and Ward is not 'high crime area.'

I declare under penalty of perjury that the foregoing is true and correct and where based on information and belief, I believe to be true.

Signed this 19th day of November, 2014 at Berkeley, California.

Timothy J. O'Brien_____
Signed (electronically)

O'BRIEN DECLARATION  - EXHIBIT A

O'BRIEN DECLARATION  - EXHIBIT B



CLICK then DRAG

Use Mini Icons

464 crimes between 10/31/2014 - 11/19/2014

O'BRIEN DECLARATION  - EXHIBITS C, D, E



