UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br>v.<br>DAVID CONERLY,<br>    Defendant. | Case No.  13-cr-00717-JST-1<br><br>**ORDER GRANTING MOTION TO SUPPRESS**<br>Re: ECF No. 69 |

Defendant David Conerly now moves to suppress all physical evidence that officers of the Berkeley Police Department obtained after they arrested and searched him following his flight from a police vehicle on February 22, 2013.  Conerly also seeks to suppress statements he made following his arrest, as fruits of the unlawful arrest and search.  For the reasons set forth below, the motion is GRANTED.

**I.    BACKGROUND**

   **A.    Procedural History**

In October 2013, the United States indicted Conerly for violation of 18 U.S.C. 922(g)(1), being a felon in possession of a firearm and ammunition.  Defendant filed the instant motion to suppress on September 30, 2014.  ECF No. 69.  The matter came on for hearing on November 24, 2014.

   **B.    Factual History**

      **i.    Officers' Initial Encounter with Conerly**

On the afternoon of February 22, 2013, Officers Lathrop and Flores of the Berkeley Police Department Drug Task Force were patrolling the area near San Pablo Park in a semi-marked vehicle.  Lathrop Police Report, ECF No. 80-1 at 6.  Officer Lathrop testified by declaration that this area is "commonly frequented by individuals possessing firearms and engaging in drug

dealing." Lathrop Declaration, ECF No. 80-6 at 2. The officers observed an adult black male, later identified as Conerly, walking down Park Street. Lathrop Police Report, ECF No. 80-1 at 6. When Conerly saw the police vehicle, he "immediately fled into the block behind 2627 Park Street." Id. Officer Flores "exited the vehicle and said 'stop police.'" Id. Conerly did not comply and continued to flee. Id. The officers "set up a perimeter to contain the block," but found "no sign" of Conerly. Id. An anonymous citizen told the officers that they had seen Conerly heading towards 2748 Acton Street, a residential home outside of which that citizen had earlier observed Conerly loitering. Id.

### ii.     Officers' Arrival at 2748 Acton Street

After speaking with the anonymous individual, the officers proceeded to 2748 Acton Street. Id. Upon their arrival, they observed an individual who "appeared to be sweating and nervous" exit the house. Id. The individual then entered a Chevy Tahoe, which the officers approached. Id. The smell of burnt marijuana emanated from the vehicle. Id. Officers detained the individual, who identified himself as Antoine Custer, and informed the officers that his nephew Robert Custer resided in the home. Id. Antoine Custer told the officers that the only person currently inside the house was his grandmother, Emma Custer. Id. The officers then conducted a record check of Robert Custer, which revealed that he was on probation with an active search clause and registered as living at the Acton Street address. Id.

### iii.     Entry of Action Street Home

After discovering that a resident of the home had an active probation search condition, Officers Lathrop and Flores entered the home along with "other BPD officers" who had arrived on the scene. Id.[1] Although the basis of the officers' entry into the home was a probation search of Robert Custer, Conerly states that the officers entered without knocking and had their guns drawn. Conerly Declaration at ECF No. 69 at 18, ¶ 3-4. Once inside the home, the officers saw Conerly

---

[1] Officer Lathrop's Police Report does not state how many officers entered the home, but implies there were at least four officers. See ECF No. 80-1 at 6 ("Ofc Flores and I and other BPD officers entered the residence to conduct a probation search of Robert Custer"). Conerly estimates that "there were more than five officers there." Conerly Declaration at ECF No. 69 at 18, ¶ 3.

2

exit the northwest bedroom, immediately recognizing him as the individual who had fled from them near San Pablo Park. Lathrop Police Report, ECF No. 80-1 at 6. "Conerly was ordered to put his hands on his head, and was then handcuffed and escorted outside without delay." Lathrop Declaration, ECF No. 80-6 at ¶ 7. Conerly says that officers "had their guns on [him] the whole time." Conerly Declaration, ECF No. 69 at 18, ¶ 3-4. The officers admit that they entered the home with "their weapons drawn for safety," but claim "[n]o weapons were trained on Mr. Conerly after he was handcuffed." Lathrop Declaration, ECF No. 80-6 at ¶8.

Conerly maintains that the officers did not ask his name or identity before searching him. Conerly Declaration, ECF No. 69 at 18, ¶ 4. Officer Lathrop contends that, prior to searching Conerly, the officers conducted a records check, which established that Conerly was on parole. Lathrop Declaration, ECF No. 80-6 at ¶ 7. The search recovered "1.40 g of suspected marijuana and $1003 cash." Lathrop Police Report, ECF No. 80-1 at 6.

After detaining Conerly, the officers received consent from Emma Custer to search the home. Id. The officers then continued to search the home "in an attempt to determine who resides in the northwest bedroom." Id. The officers observed crack cocaine packaged for sale "on the bed along the north wall of the bedroom." Id. The officers also saw the red jacket Conerly had been wearing when they initially observed him on a couch in the living room. Id.

### iv. Transport to Jail and Subsequent Confession

While other officers conducted the search of the Acton Street home, Officer Dozier transported Conerly to the BPD jail for booking for a violation of Cal. Penal Code § 148. Id. Following Conerly's arrival at the jail, Sergeant Hong informed Conerly of his Miranda rights. Dozier Police Report, ECF No. 80-1 at 10. After Conerly was booked, he "spontaneously stated" to Dozier that he needed to tell him something. Id. Conerly told Dozier that he had a loaded gun that was at the Acton Street house underneath a pillow "in the kids room." Id. Conerly stated that he did not want "that lady to get in any trouble," but initially refused to put a statement in writing claiming ownership of the gun. Id. Dozier persuaded Conerly to put in writing what he had told him regarding the gun. Id. Conerly wrote "Handgun mines owing up to my responsibility in young man room under pillow." Exhibit D, ECF No. 23-2 at 18.

Sergeant Lindenau, an officer conducting the search of the Acton Street home, contacted Officer Dozier to inform him that the officers had not been able to find the gun where Conerly had told Dozier that it was located inside the bedroom. Dozier Police Report, ECF No. 80-1 at 10. Lindenau asked Dozier to again "talk with Conerly to see where the gun was." Id. Dozier attempted to talk to Conerly again, but Conerly now denied ownership of the gun. Id. After Dozier left Conerly, Lindenau informed him that officers searching the home had "located the gun in a white bag, at the foot of the same bed that Conerly said the gun was hidden." Id.

Later that evening, Conerly made a telephone call from jail, during which he stated that "[t]hey found the pistol." ECF No. 80-1 at 17. When asked by the woman to whom he was speaking "what that have to do with you?," Conerly admitted "[i]t was mine." Id. The woman then asked how the officers knew the weapon belong to Conerly and Conerly responded "[c]ause I . . . I told them it was mine. I didn't want them people to get in trouble for me." Id.

### C.     Legal Standard

The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. Const. amend. IV. "Searches and seizures that offend the Fourth Amendment are unlawful and evidence obtained as a direct or indirect result of such invasions is considered 'fruit of the poisonous tree' and is inadmissible under the exclusionary rule." United States v. McClendon, 713 F.3d 1211, 1215 (9th Cir. 2013) (citing Wong Sun v. United States, 371 U.S. 471, 484-87 (1963)). The "burden of proving that a warrantless search or seizure falls within an exception to the warrant requirement is on the government." United States v. Scott, 705 F.3d 410, 416 (9th Cir. 2012).

## II.    ANALYSIS

The officers sought to detain Conerly at the intersection of Park and Oregon streets, pursued him when he refused to comply, entered the Acton Street home, seized Conerly, and searched his person. The government now seeks to admit evidence obtained as a result of the search and arrest of Conerly inside the Acton Street home.

### A.     Initial Interaction and Flight from Officers

At the suppression hearing, Conerly's counsel contended that Conerly was seized when

4

Officer Flores told him to stop. Conerly did not make this argument in his briefing. Regardless, "a person is not 'seized' within the meaning of the Fourth Amendment unless 'by means of physical force or show of authority, his freedom of movement is restrained.'" United States v. Smith, 633 F.3d 889, 892 (9th Cir. 2011) (citing United States v. Mendenhall, 446 U.S. 544, 553 (1980)). "In the absence of physical force, in order to constitute a seizure, an officer's show of authority must be accompanied by '*submission* to the assertion of authority.'" Id. (citing California v. Hodari D., 499 U.S. 621, 626 (1991)). Because Conerly continued to flee and did not submit to Officer Flores' show of authority, he was not seized by Officer Flores' order that he stop.

### B. Officers' Entry into the Acton Street Home

Following a lead from an unnamed citizen, the officers determined that Conerly had entered the home located at 2748 Acton Street. After officers arrived at the Acton Street home, but before they entered, they observed Antoine Custer exit the home in a suspicious manner and enter a vehicle, from which they smelled marijuana emanating. Officers then detained Custer and spoke with him to inquire who resided in the home. This detention was lawful, and in any event, Conerly lacks standing to challenge it. See Rakas v. Illinois, 439 U.S. 128, 133-34 (1978) (holding that "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.")

Antoine Custer then told officers that one of the residents of the Acton Street house was his nephew Robert Custer. Officers determined that Robert Custer was on probation for a violation of California Penal Code section 12021, which officers "knew to be a firearms offense." Lathrop Declaration, ECF No. 80-6 at ¶ 5. Officers then entered the Acton Street house. "[T]he Fourth Amendment permits a suspicionless search of a probationer's residence" where "a violent felon has accepted a suspicionless-search condition as part of a probation agreement." United States v. King, 736 F.3d 805, 806 (9th Cir. 2013) cert. denied, 134 S. Ct. 1492 (2014).

Although officers had pursued Conerly to the home and their interest in entering the home was clearly related to their efforts to apprehend Conerly, "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." Whren v. United States, 517 U.S. 806,

813 (1996). Therefore, so long as the officers had a lawful basis to enter the home, their actual motives for doing so are not relevant. Because the officers had probable cause to believe that Robert Custer, a probationer with a suspicionless-search condition, resided in the home, their entry into the home was lawful.

### C.     Was Conerly Arrested or Detained?

Although the asserted basis for the officers' entry into the Acton Street home was to conduct a probation search of Robert Custer, they entered with guns drawn and, "within seconds of entering the house," apprehended and handcuffed Conerly after observing him exit a bedroom. Conerly alleges the use of these police tactics constituted an arrest for which the officers lacked sufficient probable cause. The government counters that officers' actions amount to a detention of Conerly, not an arrest, and that the officers possessed reasonable suspicion to detain Conerly due to his prior flight from them.

"There is . . . no bright line rule for determining when an investigatory stop crosses the line and becomes an arrest." Allen v. City of Los Angeles, 66 F.3d 1052, 1056 (9th Cir. 1995) (internal quotations and citation omitted). In determining whether the "totality of the circumstances" indicate police effectuated an arrest or a detention, courts are to "consider both the intrusiveness of the stop, i.e., the aggressiveness of the police methods and how much the plaintiff's liberty was restricted, and the justification for the use of such tactics, i.e., whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken." Washington v. Lambert, 98 F.3d 1181, 1185 (9th Cir. 1996) (internal quotations and citations omitted). This is because police are permitted "to take the steps necessary to protect themselves when they have adequate reason to believe that stopping and questioning the suspect will pose particular risks to their safety." Id., 98 F.3d at 1186.

In United States v. Delgadillo-Velasquez, 856 F.2d 1292, 1295 (9th Cir. 1988), the Ninth Circuit held that police conduct constituted an arrest where the officers had "approached with weapons drawn, cried halt, and required the three men to lie face down in the street while they were handcuffed" and then told the men they were under arrest. Nonetheless, the Ninth Circuit subsequently held in Allen that "[p]ointing a weapon at a suspect, ordering him to lie on the

ground, handcuffing him, and placing him for a brief period in a police vehicle for questioning—whether singly or in combination—does not *automatically* convert an investigatory detention into an arrest requiring probable cause." 66 F.3d at 1056 (emphasis added). Synthesizing that holding with Delgadillo-Velasquez and other cases in which the Ninth Circuit had found such tactics had effectuated an arrest, the panel in Allen reasoned that the conduct in Delgadillo-Velasquez had constituted an arrest because "the defendant was fully cooperative, and there was no evidence suggesting he was dangerous or that safety considerations required such intrusive methods of restraint." Id. at 1057.

Conerly argues that the totality of the circumstances indicate he was arrested when five police officers entered the Acton Street home "without knocking, with guns drawn, yelling commands at him" and immediately handcuffed him. ECF No. 69 at 7. The government argues that, in this case, officers did not arrest Conerly when they pointed their weapons at him and immediately placed him in handcuffs, as they took these measures out of a concern for their personal safety. The government notes that Conerly had fled from officers into a home, where he could have armed himself. The government also points to Antoine Custer's nervousness upon exiting the home as evidence that suggested to officers the "possibility of ongoing criminal activity" within the home. ECF No. 80 at 15.

The Court cannot agree with the government that the officers' apprehension of Conerly was merely a detention. As in Lambert and Delgadillo-Velasquez, the intrusiveness of the police tactics far outweighed the justifications for the use of those tactics. Nothing in Conerly's conduct in fleeing from the officers at the intersection of Park and Oregon Streets gave officers any indication that Conerly presented a danger to the officers' safety. At the time officers first saw Conerly, they had no information that he was engaging in criminal activity or on parole, and he had taken no threatening actions to officers or anyone else. The officers' lawful justification for their entry into the home was to conduct a suspicionless probation search of Custer's residence, not a claim of exigent circumstances relating to Conerly's conduct. The officers also do not allege that Conerly took any action when exiting the bedroom that suggested he posed a threat to the officers or anyone else. Although Conerly had previously fled from officers on the street, Conerly

7

was cornered by officers within the home at the time he was apprehended, and did not pose a threat of escape. "[T]he number of police officers present" and "the ratio of officers to suspects present" also indicate that the police conduct was more intrusive than necessary to conduct a detention under the circumstances. Lambert, 98 F.3d. at 1190.

Examining the facts known to the officers at the time they apprehended Conerly, the intrusiveness of the tactics used far outweighed the safety considerations proffered by the government as justification of those tactics. The Court finds that officers arrested Conerly.

### D. Probable Cause

Because the officers arrested Conerly immediately upon seeing him exit a bedroom in the Acton Street home, the lawfulness of his arrest hinges on whether, at that moment, the officers possessed probable cause to believe that Conerly had committed a crime.[2] The government contends that the officers had probable cause to arrest Conerly, as his flight from them constituted a violation of California Penal Code § 148(a)(1) and Conerly was in possession of marijuana in violation of Cal. Health & Safety Code § 11357(b).

#### 1. Violation of § 148(a)(1)

The government contends that Conerly's flight from Officer Flores' order that he stop gave the officers "a lawful basis to arrest him" when they entered the home, as such flight was in violation of California Penal Code section 148(a)(1) ("§ 148"). That section prohibits an individual from "willfully resist[ing], delay[ing], or obstruct[ing] any public officer, peace officer, or an emergency medical technician . . . in the discharge or attempt to discharge any duty of his or her office or employment." Id. The government contends that "running from a police officer is one of the acts through which § 148 can be violated." Government's Opposition, ECF No. 80 at 5.

But California courts have not interpreted § 148 so broadly. In People v. Allen, 109 Cal. App. 3d 981, 987 (1980), the California Court of Appeals for the Fifth District held that a defendant violates § 148 when he flees with "the clear knowledge that the officer wanted to detain and talk with him." The court concluded that the defendant in that case had violated § 148, as the

---

[2] Although Conerly was a parolee with a search condition, the officers were unaware of this at the time they arrested him.

8

officer had possessed reasonable suspicion the defendant was involved in criminal activity when he sought to effect the detention from which the defendant fled. Prior to his approach, the officer had observed the defendant speaking with a group of 10 to 15 people standing around the open trunk of a vehicle that contained a pile of jackets. Id. at 983. When the defendant saw police approaching, he "slammed the trunk lid of the vehicle closed" and fled. Id. The officer therefore had reasonable suspicion that Allen was engaged in unlawful activity and Allen "knew full well, and counsel conceded so at argument, that the officer's attention was centered on him and that the officer wanted to talk with him." Id. at 987.

Numerous panels of the California Court of Appeal have limited Allen to circumstances where the detention that officers had sought to effectuate at the time that the defendant fled would have been lawful. See, e.g., People v. Ramirez, 140 Cal. App. 4th 849, 854 (2006) ("Because there was no legal basis for the initial stop, Allen is inapposite."); In re Jose S., Case No. H029039, 2006 WL 540794, at *3 (Cal. Ct. App. Mar. 7, 2006) (distinguishing case from Allen because "immediately prior to the minor's flight, [the officer] did *not* have specific and articulable facts that the minor was involved in criminal activity" and detention would not have been lawful); People v. Valenzuela-Rodriguez, No. Case No. F048766, 2007 WL 586688, at *10 (Cal. Ct. App. Feb. 27, 2007) ("Unlike *Allen* . . . there was no facts suggesting defendant was engaged in any criminal activities before she ran from the station wagon which would support a lawful attempt to detain her."). The rule of Allen has therefore been succinctly summarized as follows: "Flight from an officer attempting to effect a *lawful* detention can constitute resisting or delaying a peace officer, provided the person fleeing knows the officer wishes to detain him." People v. Campos, No. B245614, 2013 WL 5945084, at *3 (Cal. Ct. App. Nov. 6, 2013) (emphasis added).

Under Terry v. Ohio, 392 U.S. 1 (1968), and its progeny, police officers may lawfully detain an individual "for brief, investigatory purposes, provided the officers making the stop have reasonable suspicion 'that criminal activity may be afoot.'" United States v. Johnson, 581 F.3d 994, 999 (9th Cir. 2009) (quoting United States v. Orman, 486 F.3d 1170, 1173 (9th Cir. 2007)). "While reasonable suspicion is a less demanding standard than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the

stop." Illinois v. Wardlow, 528 U.S. 119, 124 (1999). "The officer must be able to article more than an 'inchoate and unparticularized suspicion or 'hunch' of criminal activity.'" Id. (citing Terry, 392 U.S. at 27). "[A] refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." Florida v. Bostick, 501 U.S. 429, 437 (1991).

Therefore, whether Conerly could have been arrested in the home for a violation of § 148 for not complying with Officer Flores' order that stop depends on whether the officers had reasonable suspicion to detain Conerly when they saw him flee from the sight of the police car, before Officer Flores' ordered him to stop. As opposed to Allen, where officers had observed the defendant apparently selling stolen goods immediately prior to his flight, officers did not witness Conerly engage in any behavior suggestive of criminal activity prior to his flight.

Citing Illinois v. Wardlow, 528 U.S. 119 (1999), the government responds that additional suspicious behavior is not required where a suspect flees from the police in a high crime area, as Conerly allegedly did here, because such flight by itself provides reasonable suspicion. In Wardlow, the Court held that officers had not violated the Fourth Amendment by detaining and conducting a Terry search on an individual who "fled upon seeing police officers patrolling an area known for heavy narcotics trafficking." Id. at 121. The Court acknowledged that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." Id. at 124. But the Court noted that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion," and that "[h]eadlong flight--wherever it occurs--is the consummate act of evasion." Id. Looking to the totality of the circumstances, the Court concluded that an individual's headlong flight from police officers in a high crime area provides officers with reasonable suspicion to conduct a Terry stop. Id.

Because the majority relied on *both* Wardlow's flight and the character of the neighborhood in concluding that police officers possessed probable cause, courts have generally concluded that "Wardlow cannot be used to justify stopping everyone who flees from police." United States v. Navedo, 694 F.3d 463, 471 (3d Cir. 2012). Indeed, the Ninth Circuit has

summarized Wardlow as holding that "a person's 'headlong,' 'unprovoked' flight upon seeing a police officer, *when it occurs in a high-crime neighborhood*, is sufficient to establish reasonable suspicion that the person is involved in criminal activity." United States v. Smith, 633 F.3d 889, 893 (9th Cir. 2011) (emphasis added).  This reading is bolstered by Justice Stevens's dissent in Wardlow, joined by three other justices, which noted that the majority's decision, in looking to the "totality of the circumstances," had rejected the State of Illinois's request for a "'bright-line rule' authorizing the temporary detention of anyone who flees at the mere sight of a police officer." Wardlow, 528 U.S. at 126 (Stevens, J., dissenting).  The dissent noted that "[f]actors such as the time of day, the number of people in the area, the character of the neighborhood, whether the officer was in uniform, the way the runner was dressed, the direction and speech of the flight, and whether the person's behavior was otherwise unusual might be relevant in specific cases" to determining whether an individual's flight provided officers with reasonable suspicion to detain him.  Id. at 129-30.

The only factor other than flight offered by the government to support Officer Flores' attempt to detain Conerly is the character of the area, which the government contends is a "high crime area" within the meaning of Wardlow.  The Ninth Circuit, sitting *en banc*, has cautioned that "the citing of an area as 'high-crime' requires careful examination by the court, because such a description, unless properly limited and factually based, can easily serve as a proxy for race or ethnicity." United States v. Montero-Camargo, 208 F.3d 1122, 1138 (9th Cir. 2000).  Courts "must be particularly careful to ensure that a 'high crime' area factor is not used with respect to entire neighborhoods or communities in which members of minority groups regularly go about their daily business, but is limited to specific, circumscribed locations where particular crimes occur with unusual regularity." Id.

At the suppression hearing, the government contended for the first time that this Court should determine whether an area is "high crime" within the meaning of Wardlow by looking to Berkeley City Council Districts.  Berkeley consists of eight such Districts, each of which contains more than 12,500 residents.  Because the Berkeley Police Department maintains crime statistics based on these Districts, the government argues that entire Districts could be deemed "high crime

11

areas" depending on their volume of crime relative to other Districts within the City.  The government has presented evidence that District 2, in which Officer Flores first saw Conerly flee from the police vehicle, had the third highest number of total incident reports, the third highest number of violent crime reports, and the second highest number of drug crime reports out of the eight Districts in Berkeley from the period of 5/26/2014 to 11/21/2014.

The government's evidence is problematic.  First, even if the area the Government had selected were not too large, there would be little probative value in the ranking of District 2 relative to other (equally large) districts in the city.  This approach would mean that within every municipality, there would be "high crime areas," even if crime in that municipality were low on the whole.  Wardlow discusses the high crime area in that case as one "known for heavy narcotics trafficking" where "officers anticipated encountering a large number of people in the area, including drug customers and individuals serving as lookouts."  Wardlow, 528 U.S. at 123.  Many communities contain no such locations.[3]

The Court also does not agree with the government's contention that the determination of whether the area in which a stop is made is "high crime" should be made by looking at the entire City Council District in which the stop occurred.  The Ninth Circuit instructed in Montero-Camargo that courts should apply the high crime area factor to "specific, circumscribed locations" and not to "entire neighborhoods or communities."  Id.  A City Council District containing one-eighth of that City's population is not a "specific, circumscribed location[]."  Therefore, the Court will determine whether the intersection of Oregon Street and Park Street was a high crime area by looking at crime data for that intersection and the blocks immediately surrounding it and not the

---

[3] Plano, Texas, for example, a "clean, affluent suburb with no inner city per se" has the lowest violent crime rate in the country.  Beth Greenfield, America's Safest Cities, Forbes (12/15/11 4:30 p.m.), http://www.forbes.com/sites/bethgreenfield/2011/12/15/americas-safest-cities/ (last visited on Dec. 6, 2014).  It is possible that no area in Plano would qualify as "high crime."  Detroit, on the other hand, has the highest violent crime rate in the country:  2,137 per 100,000 residents, five times the national average.   Daniel Fisher, Detroit Tops The 2012 List of America's Most Dangerous Cities, Forbes (10/28/12 1:26 p.m.), http://www.forbes.com/sites/danielfisher/2012/10/18/detroit-tops-the-2012-list-of-americas-most-dangerous-cities/ (last visited Dec. 6, 2014).  It is likely that Detroit has more than one area that would qualify as "high crime."

1  entire District in which that block sits.

2  Turning to the evidence submitted by the parties pertaining to the area surrounding the
3  intersection of Oregon Street and Park Street, the Court concludes the government has not
4  demonstrated that the intersection and immediately surrounding area has a high volume of crime.
5  The government has submitted the testimony of officers that the area in which they first saw
6  Conerly was "an area where narcotics are sold on the street on a daily basis." Lathrop Police
7  Report, ECF No. 23-2 at 7. But the designation of areas as high crime must be "properly limited
8  and factually based" and should be applied only "to specific, circumscribed locations where
9  particular crimes occur with unusual regularity." Montero-Camargo, 208 F.3d at 1138. Officer
10 Lathrop's subjective impression of the character of the neighborhood is not supported by objective
11 indicia of frequent criminal activity that one would expect to find in such an area. This Court
12 previously granted Conerly's request for a Subpoena Duces Tecum requiring the Berkeley Police
13 Department to produce "[a]ny and all records relating to statistics and other evidence regarding the
14 number of arrests in the last year in the six block radius surrounding the intersection of Oregon
15 and Park Street in Berkeley, California." ECF No. 84. The information produced by the Berkeley
16 Police Department indicates there were just thirteen arrests for the sale of narcotics within a six
17 block radius surrounding the intersection in the last year. ECF No. 91, Exhibit 5. The Court also
18 observes that the government submitted at the hearing a "heatmap" of criminal activity in the City
19 of Berkeley, which indicates a relatively low concentration of criminal activity and calls for
20 service on the blocks immediately surrounding the intersection of Oregon and Park Streets. The
21 Court concludes that the evidence does not support a finding that the area surrounding the
22 intersection is a "high crime area."

23 Therefore, under the totality of the circumstances, Officer Flores lacked reasonable
24 suspicion to detain Conerly upon seeing him flee at the intersection, as the area was not "high
25 crime" and Conerly displayed no indicia other than flight that indicated he was engaged in
26 criminal activity. Therefore, Officer Flores' attempt to detain Conerly was unlawful and
27 Conerly's refusal to comply with his command did not provide officers with probable cause to
28 arrest Conerly for a violation of § 148 upon their entry into the Acton Street home.

13

### 2. Violation of Cal. Health & Safety Code § 11357(b)

The government also asserts that officers had probable cause to arrest Conerly for a narcotics offense for possession of marijuana, as "they smelled the strong odor of fresh marijuana coming from the defendant when they detained him in the house." ECF No. 80 at 7. But the officers have stated that they saw Conerly exit the bedroom "within seconds of entering the house," "recognized [him] as the black male who initially ran," and immediately handcuffed him. Lothrup Declaration, ECF No. 80-6 at ¶ 6; Flores Affidavit, ECF No. 80-2 at 4. Officer Flores' Police Report indicates that he "smelled a strong odor of fresh marijuana coming from Conerly's person" *after* handcuffing Conerly. Id. No officer has stated in the record that that they smelled marijuana coming from Conerly's person prior to his arrest. Therefore, officers did not have probable cause to believe Conerly had committed a violation of Cal. Health & Safety Code § 11357(b) at the time they arrested him.

### 3. Conclusion

The officers therefore lacked probable cause to arrest Conerly immediately upon seeing him exit the bedroom after they entered the Acton Street home.

### E. Conerly's Confession and Telephone Conversation

Conerly argues that his statements confessing to possession of the gun and the subsequently-discovered gun should be suppressed as fruits of the poisonous tree, because they were the direct result of his unlawful arrest. "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" Segura v. United States, 468 U.S. 796, 804 (1984). Conerly confessed to Officer Dozier immediately after he was booked for the § 148 offense for which the Court had concluded officers lacked probable cause to arrest him. Conerly made the jailtime telephone conversation later that same evening. The Court agrees that, but for Conerly's unlawful arrest, Conerly would not have confessed to Officer Dozier that he owned the gun or made a telephone call from jail in which he stated that the gun was his. These statements, and the gun that was discovered as a result, as therefore fruits of Conerly's unlawful arrest.

14

### F.     Inevitable Discovery

Finally, the government argues that the Court should find that all the evidence, including the confession, would have been inevitably discovered even without Conerly's unlawful arrest. "The inevitable discovery doctrine is an exception to the exclusionary rule." United States v. Andrade, 724 F.2d 1431, 1433 (9th Cir. 1986). "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received." Nix v. Williams, 467 U.S. 431, 444 (1984). "The inevitable discovery doctrine applies only when the fact that makes discovery inevitable is born of circumstances other than those brought to light by the illegal search itself." United States v. Reilly, 224 F.3d 986, 995 (9th Cir. 2000)

The government contends that officers lawfully entered the home due to Robert Custer's probation search condition and that, once officers were inside the home, the gun would inevitably have been discovered. The Court does not agree. The gun was not found by officers independently of Conerly's arrest, but was found only after a jailed Conerly told Officer Dozier of the weapon's location. Indeed, Officer Dozier's Police Report indicates that officers searching the home had difficulty locating the gun, even after being informed by Conerly that there was a gun inside the home and that it was located near the bed in the bedroom. Dozier states that, after an initial search of the bedroom, Sergeant Lindenau told Dozier that "the gun was not located where Conerly said it was" and asked Dozier to talk to Conerly again to see "where the gun was." ECF No. 80-1 at 10. Lindenau later found the gun "in a white bag, at the foot of the same bed that Conerly said the gun was hidden." ECF No. 80-1 at 10. Because in the absence of Conerly's arrest, officers searching the home would not have known the home contained a gun at all, the Court cannot conclude that the officers would have searched thoroughly enough to locate the gun if they had not been informed by an arrested Conerly that the gun existed and was located near the bed in the bedroom.

The government also argues that, even if they had not immediately arrested him, officers would have formed a lawful basis to search Conerly upon discovering that he was a parolee with a

search condition. The government contends that officers could have learned Conerly's name from speaking with him or reading dry cleaning receipts containing Conerly's name that were present in the home. Once the officers knew Conerly's name, the government claims they would have performed a records check that would have revealed Conerly was a parolee with a search condition. If the officers had then searched Conerly, they would have found that he had marijuana on his person. The government argues that officers would then have arrested Conerly and Conerly would have made the same confession to possession of the weapon. This type of conjecture is too speculative to establish inevitable discovery, which is typically demonstrated "by showing that the evidence would have been uncovered by officers in carrying out routine procedures." United States v. Reilly, 224 F.3d 986, 994 (9th Cir. 2000). Because Conerly's flight did not give officers probable cause to arrest him, the Court cannot conclude that officers acting lawfully would have held Conerly long enough to learn his name and perform a records search of him that would have allowed them to search him and discover the drugs on his person.

Even if police had learned his name and his status as a parolee, then searched and arrested Conerly lawfully for possession of marijuana, the dynamics of the interaction would have been altered so fundamentally that the Court cannot conclude Conerly would inevitably have confessed to ownership of the gun. Conerly confessed after five police officers entered a home they had followed him into with guns drawn and arrested him immediately on sight in the absence of probable cause. The same intrusive police tactics that this Court concludes were unlawfully employed to arrest Conerly may have influenced Conerly's subsequent decision to confess.

### III. CONCLUSION

Because the officers lacked probable cause to arrest Conerly upon their entry into the Acton Street home, the Court GRANTS Conerly's motion to suppress the physical evidence

/ / /

/ / /

/ / /

/ / /

/ / /

obtained as a result of that arrest, including the gun found in the home, as well as all subsequent statements made by Conerly while in police custody.

**IT IS SO ORDERED.**

Dated:  December 6, 2014

_____
JON S. TIGAR
United States District Judge